Filed 5/1/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM MULLER, | |
| Plaintiff and Respondent, | G055053 |
| v. | (Super. Ct. No. 30-2016-00874087) |
| ROY MILLER FREIGHT LINES, LLC, | O P I N I O N |
| Defendant and Appellant. | |

\* \* \*

Appeal from an order of the Superior Court of Orange County, Glenda Sanders, Judge. Affirmed.

Ogletree, Deakins, Nash, Smoak & Stewart, Rafael G. Nendel-Flores and Nardo J. Catahan for Defendant and Appellant.

Ackerman & Tilajef, Craig J. Ackerman and Sam Vahedi; Melmed Law Group and Jonathan Melmed, for Plaintiff and Respondent.

\* \* \*

Defendant Roy Miller Freight Lines, LLC (RMFL) appeals from an order granting in part and denying in part its motion to compel its former employee, plaintiff William Muller (Muller), to arbitrate his wage and hour claims under the arbitration provision in his employment agreement. The trial court granted RMFL's motion on all but one cause of action, Muller's claim for unpaid wages,[1] and stayed the prosecution of that remaining claim pending the completion of the arbitration.

The crux of this appeal is whether the Federal Arbitration Act (FAA) applies, and more specifically, whether Muller is a transportation worker engaged in interstate commerce under 9 U.S.C. § 1 (section 1) and thus exempt from FAA coverage. If he is exempt from FAA coverage, as the trial court held, Muller does not have to arbitrate his cause of action for unpaid wages because Labor Code section 229 (section 229) authorizes lawsuits for unpaid wages notwithstanding an agreement to arbitrate. If the FAA applies, as RMFL contends, the FAA preempts section 229, and Muller must submit his cause of action for unpaid wages to arbitration, along with his five other causes of action.

For the reasons set forth below, we affirm the trial court's order. The court correctly concluded Muller is exempt from FAA coverage under section 1. Even though Muller did not physically transport goods across state lines, his employer is in the transportation industry, and the vast majority of the goods he transported originated outside California. Thus, section 229 requires staying the prosecution of his cause of action for unpaid wages while the other five causes of action proceed to arbitration. The

---

[1]  To be precise, this first cause of action was for "failure to pay separately and hourly for time spent by drivers on rest breaks, pre- and post-trip inspection time, loading & unloading time, cleaning, fueling and paperwork time [Cal. Labor Code §§ 1194; 1194.2 and 226.2]." For simplicity's sake, we refer to it as Muller's cause of action for unpaid wages.

court also correctly concluded the arbitrator, not the court, must determine whether to conduct the arbitration on an individual or classwide basis.

## I.

### FACTS

RMFL is a licensed motor carrier company that employs truck drivers to transfer freight to and from various destinations from its six California terminals. Over 99 percent of the cargo RMFL transports originates from outside California, but RMFL only transports the cargo within California. The record is silent on whether freight transported by RMFL within California is later transported by other carriers to destinations outside California.

Muller worked as an RMFL truck driver for less than a year. Like other RMFL drivers, all his trips were entirely within California; he never transported freight across state lines. According to RMFL's records, Muller's deliveries typically involved driving from RMFL's Fresno terminal to locations like San Jose or Sacramento, and then back to Fresno.

At RMFL's request, Muller signed a two-page written agreement requiring him to "utilize binding arbitration to resolve all disputes that may arise out of the employment context." The agreement required any claim Muller has against RMFL arising out of his employment to "be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the Federal Rules of Civil Procedure." The agreement also stated Muller and RMFL both "give up [their] right to trial by jury of any claim" against one another.

Muller's employment with RMFL ended in September 2014. Two years later, he filed a putative class action complaint against RMFL, asserting causes of action for unpaid wages, unpaid rest breaks, incomplete wage statements, missed meal periods, waiting time penalties, and unfair competition.

3

RMFL moved to compel individual arbitration. In support of its motion, RMFL provided two declarations by its operations manager, who attested that "[o]ver 99 [percent] of all cargo RMFL transports begins its trip and originates from *outside* the State of California," but that Muller's assigned deliveries were "exclusively *within* the State of California." (Italics added.) Muller opposed the motion, but he did not dispute his delivery work for RMFL was entirely intrastate.

After hearing oral argument and taking the matter under submission, the trial court issued an order granting in part and denying in part RMFL's motion to compel in the manner noted above. RMFL timely appealed the order.

## II.

### DISCUSSION

#### A.     *General Principles*

Because an order denying a petition to compel arbitration is appealable, we may review the portion of the trial court's order denying RMFL's motion to compel arbitration of Muller's cause of action for unpaid wages. (Code Civ. Proc., § 1294, subd. (a).)

"When a trial court's order [denying a petition to compel arbitration] is based on a question of law, we review the denial de novo. [Citation.] Decisions on issues of fact are reviewed for substantial evidence. [Citation.]" (*Performance Team Freight Systems, Inc. v. Aleman* (2015) 241 Cal.App.4th 1233, 1239 (*Performance Team*).)

#### B.     *The Applicability of the FAA*

1.     The FAA and the Section 1 Exemption for "Transportation Workers"

Congress enacted the FAA in 1925 to remedy the general hostility of American courts to the enforcement of arbitration agreements. To effectuate that purpose, the FAA compels judicial enforcement of a wide range of written arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.

4

(*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 111 (*Circuit City*); *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 237-238.) When the FAA applies, it preempts any state law rule that "'stand[s] as an obstacle to the accomplishment of the FAA's objectives.'" (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 384.)

The FAA's basic coverage provision, section 2, makes the FAA applicable to contracts "evidencing a transaction involving commerce." (9 U.S.C. § 2.) Courts broadly construe section 2 to "provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." (*Perry v. Thomas* (1987) 482 U.S. 483, 490 (*Perry*).) "Accordingly, in most cases, the FAA mandates arbitration when contracts involving interstate commerce contain arbitration provisions." (*Performance Team, supra,* 241 Cal.App.4th at p. 1239.)

Section 1 of the FAA provides a limited exemption from FAA coverage to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) In *Circuit City,* the United States Supreme Court concluded section 1's catchall phrase "'any other class of workers engaged in foreign or interstate commerce'" does not refer to *all* workers involved in foreign or interstate commerce, but rather only to "transportation workers." (*Circuit City, supra,* 532 U.S. at pp. 119, 121.)

The Supreme Court reasoned the plain meaning of "'engaged in'" interstate commerce in section 1 is narrower in scope than the open-ended phrase "'involving'" commerce in section 2. (*Circuit City,* 532 U.S. at pp. 118-124.) Unlike section 2's reference to "involving commerce," which "indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause" and thus is afforded an "expansive reading," section 1's reference to "engaged in commerce" is "narrower," and therefore "understood to have a more limited reach," requiring "a narrow construction" and a "precise reading." (*Id.* at pp. 114, 115, 118-119.)

5

In support of its holding, the Supreme Court observed Congress presumably excluded the employment contracts of the specific workers listed in section 1 "because of Congress' undoubted authority to govern the employment relationships at issue by the enactment of statutes specific to them." (*Circuit City*, *supra*, 532 U.S. at pp. 120-121.) The Court noted that when Congress passed the FAA, more specific and comprehensive federal arbitration procedures for seamen and railroad employees were either already in existence or on the verge of passage. (See *id*. at p. 121.) Congress ostensibly "did not wish to unsettle established or developing statutory dispute resolution schemes covering [those] specific workers," and therefore "ensure[d] that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation." (*Ibid*.)

2.      Divergent Tests for Who Qualifies as a "Transportation Worker"

The term "transportation worker" was not at issue in *Circuit City*, so the Supreme Court did not adopt a specific definition. Although the Court noted with approval one appellate court's definition of transportation workers as "those workers "'actually engaged in the movement of goods in interstate commerce"'" (*Circuit City, supra*, 532 U.S. at p. 112), it did not elaborate on what type of connection the worker must have to interstate commerce, to what degree his or her duties must involve transportation, to what degree the employer's industry must be related to transportation, or whether the worker must cross state lines for the exemption to apply.[2]

In the 18 years since the Supreme Court decided *Circuit City*, state and federal courts have grappled with these unresolved issues, but "little consensus has been realized." (*Kowalewski v. Samandarov* (S.D.N.Y. 2008) 590 F.Supp.2d 477, 482

---

[2]      Although the Supreme Court recently interpreted section 1 again in *New Prime Inc. v. Oliveira* (2019) 139 S.Ct. 532, 534, it did not elaborate on the meaning of the term "transportation workers."

6

(*Kowalewski*).) Some decisions have focused on whether the employer is in the transportation industry. (See, e.g., *Hill v. Rent-A-Center, Inc.* (11th Cir. 2005) 398 F.3d 1286, 1290.) Other courts have focused on the nature of the particular employee's work, looking at factors like whether the employee transported goods rather than passengers (see, e.g., *Kowalewski*, *supra*, at pp. 482-483), whether the employee personally traversed state lines (see, e.g., *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC* (7th Cir. 2012) 702 F.3d 954, 957 (*Kienstra*); *Levin v. Caviar, Inc.* (N.D. Cal. 2015) 146 F.Supp.3d 1146, 1152 (*Levin*)), or whether the employee's regular job duties involved handling goods in the stream of interstate commerce (*Wallace v. Grubhub Holdings* (N.D. Ill., Mar. 28, 2019, No. 18 C 4538) [2019 U.S. Dist. LEXIS 52629, 2019 WL 1399986, at *4]).

The decisions become more varied when the employee is one step removed from the actual physical delivery of goods. For example, "[t]wo courts have concluded that postal workers, who process packages that move interstate, are exempt under § 1 [citations], while another court has held that a worker who loaded and unloaded trucks that moved across state lines was not a transportation worker [citation]. One court has even determined that the supervisor of interstate truck drivers was considered a transportation worker. [Citation.]." (*Lorntzen v. Swift Transportation, Inc.* (D. Kan. 2004) 316 F.Supp.2d 1093, 1097 (*Lorntzen*); see *Lenz v. Yellow Transp., Inc.* (8th Cir. 2005) 431 F.3d 348, 351 (*Lenz*) [whether an employee who "works for a transportation company but is not a truck driver or transporter of goods" is a transportation worker is a "more difficult question"].) Suffice it to say there is no agreed-upon bright-line rule on who falls within the section 1 exemption.

In *Lenz,* the Eighth Circuit Court of Appeals attempted to synthesize the factors courts often consider in determining the exemption applies, and it identified eight "non-exclusive" factors for consideration when evaluating whether an employee "is so closely related to interstate commerce that he or she fits within the § 1 exemption of the

FAA." (*Lenz, supra*, 431 F.3d at p. 352.) Those factors are: "first, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck driver whose only job is to deliver goods cannot perform his job without a truck)." (*Ibid.*)

3.      Whether Truckers Are "Transportation Workers"

As noted, this particular case involves a truck driver. Courts are somewhat divided on whether and when truckers and delivery drivers qualify as "transportation workers."

If a truck driver physically transports goods across state lines, he or she undoubtedly qualifies as a transportation worker under section 1. (*Muro v. Cornerstone Staffing Solutions, Inc.* (2018) 20 Cal.App.5th 784, 790-791 (*Muro*).) Indeed, the "'most obvious'" example of a transportation worker is an "'interstate truck driver whose primary function is to deliver mailing packages from one state into another.'" (*Garrido v. Air Liquide Industrial U.S. LP* (2015) 241 Cal.App.4th 833, 840-841 [if driver crosses state lines he or she is "'"actually engaged in the movement of goods in interstate commerce"'"]; see *Muro, supra*, at pp. 790-791 [concluding "driver who transported goods and often did so across state lines" is a transportation worker, even if his employer is not part of the transportation industry]; *Performance Team*, *supra*, 241 Cal.App.4th at

8

p. 1240 ["[t]ruck drivers who cross interstate lines usually are considered transportation workers"].)[3]

A more difficult question arises, however, when the truck driver *never* crosses state lines in performing his or her duties. (See *Performance Team, supra,* 241 Cal.App.4th at p. 1240 [noting it is "not clear" whether drivers whose routes are only "to destinations within California" qualify as transportation workers under section 1].) Is the mere act of transporting goods that originated in other states sufficient to trigger the exemption? Or must the driver *personally* cross state lines in performing his or her job duties?

While this appeal was pending, our colleagues in the Fifth District concluded interstate travel is *not* necessary for section 1 to apply and held a delivery driver may fall "within the scope of the exemption even though his deliveries were exclusively to destinations within California." (*Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 282.) The *Nieto* court began by noting courts have consistently held that drivers who are actually involved in the interstate transportation of

---

[3]    State and federal courts throughout the country have reached the same conclusion. (See, e.g., *Kienstra, supra,* 702 F.3d at p. 957 [truckers based in Illinois who "occasionally transported loads into Missouri" "were interstate transportation workers within the meaning of § 1," because if the driver "crosses state lines he is 'actually engaged in the movement of goods in interstate commerce'"]; *Harden v. Roadway Package Systems, Inc.* (9th Cir. 2001) 249 F.3d 1137, 1140 [delivery driver who "contracted to deliver packages 'throughout the United States, with connecting international service' . . . [was] engaged in interstate commerce that is exempt from the FAA"]; *Vargas v. Delivery Outsourcing, LLC* (N.D. Cal., Mar. 14, 2016, No. 15-CV-03408-JST) [2016 U.S. Dist. LEXIS 32634, 2016 WL 946112, at *4 (*Vargas*) ["[d]elivery drivers may fall within the exemption for 'transportation workers' even if they make interstate deliveries only 'occasionally'"]; *In re Swift Transportation Co., Inc.* (Tex. App. 2009) 311 S.W.3d 484, 487-489 [Texas truck driver who transported goods in Illinois was a transportation worker]; *Gagnon v. Service Trucking Inc.* (M.D. Fla. 2003) 266 F.Supp.2d 1361, 1364, vacated pursuant to settlement agreement ["truck driver . . . who transports goods across state lines" is a transportation worker].)

9

physical goods are transportation workers under section 1. (*Id.* at p. 281.) It also observed that under the *Circuit City* definition of transportation workers, "merely being a delivery truck driver, by itself, would not be enough since a transportation worker must also be ""'actually engaged in the movement of goods in interstate commerce.'""" (*Id.* at p. 282.) However, the *Nieto* court then rejected the notion that a delivery driver who never crosses state lines is not "'engaged in interstate commerce,'" describing that argument as "overbroad, at least in the particular case and context before us." (*Ibid.*) It also noted the absence of "any clear or persuasive authority for the proposition that crossing of state lines is a necessary condition for the exemption to apply."[4] (*Ibid.*) The court went on to hold that "a transportation worker does not necessarily have to physically cross state lines in order to engage in the movement of goods in interstate commerce." (*Ibid.*)

The *Nieto* court then concluded the delivery driver *was* "engaged in interstate commerce during his employment" in light of the following admitted facts: the employer sold and distributed beer, wines, and other beverages that originated in other states and countries; although the employer's drivers did not transport goods across state lines, they were nevertheless subject to federal Department of Transportation regulations and other federal laws and regulations governing motor vehicle safety; they traversed interstate highways and roads; and, in the words of the employer in its briefing, its drivers transported the items as part of a "practical continuity of movement" in the flow of interstate commerce. (*Nieto*, *supra*, 33 Cal.App.5th at p. 284, quoting *Walling v. Jacksonville Paper Co.* (1943) 317 U.S. 564.) Thus, concluded the court: "It is apparent from the above information and concessions that Nieto's deliveries, although intrastate, were essentially the last phase of a continuous journey of the interstate commerce (i.e., beer and other beverages delivered to VWB's warehouse from out-of-state) being

---

[4]     The *Nieto* court did not address the conflicting federal precedent discussed *infra*.

10

transported until reaching its destination(s) to VWB's customers. Accordingly, as a delivery truck driver for VWB, Nieto was engaged in interstate commerce through his participation in the continuation of the movement of interstate goods to their destinations. Therefore, the trial court did not err in concluding that Nieto was employed as a transportation worker engaged in interstate commerce to whom the exemption of section 1 of the FAA was applicable." (*Ibid.*)

In reaching this conclusion, the *Nieto* court relied in part on *Christie v. Loomis Armored US, Inc*. (D.Colo. 2011) [2011 U.S. Dist. LEXIS 141994, 2011 WL 6152979, at *3, *7] (*Christie*). In *Christie*, the district court held a driver "need not actually transport goods across state lines to be part of a class of employees engaged in interstate commerce. 'Interstate commerce' includes not only goods that travel across state lines but also 'the intrastate transport of goods in the flow of interstate commerce.'" (*Id.* at *3.) The court found section 1 applied because the employer, Loomis, was registered with the Department of Transportation and was engaged in the business of interstate transport of currency, and because the driver's job was "to transport currency, a good that is undisputedly in the stream of interstate commerce." (*Ibid.*) Thus, while there was no evidence the driver personally delivered goods across state lines, she nevertheless qualified as a transportation worker.[5]

---

[5] The *Christie* and *Nieto* courts both relied on *Palcko v. Airborne Express, Inc*. (3d Cir. 2004) 372 F.3d 588 (*Palcko*), in which the Third Circuit Court of Appeals held an employee need not cross state lines to qualify as a transportation worker. The plaintiff in *Palcko* was not a delivery driver; rather, she supervised drivers who delivered interstate packages from the Airborne Express facility near the Philadelphia airport to their ultimate destinations within the Philadelphia area. (*Id.* at p. 590.) Although neither the plaintiff nor the drivers under her supervision delivered the packages across state lines, the *Palcko* court concluded the plaintiff was exempt from FAA coverage because her direct supervision of package shipments made her work "'so closely related [to interstate and foreign commerce] as to be in practical effect part of it.'" (*Id.* at pp. 593-594.) Although the plaintiff in *Palcko* was not a trucker, the case is noteworthy because the fact the plaintiff never personally crossed state lines did not prevent the court from finding section 1 applied. (*See ibid*. ["had Congress intended [section 1] to cover only

Various federal courts have reached the opposite conclusion as *Nieto* and *Christie*. For example, in *Kienstra*, the Seventh Circuit Court of Appeals held a trucker who "crosses state lines [even occasionally] is 'actually engaged in the movement of goods in interstate commerce'" and thus exempt under section 1, but suggested a trucker who never crosses state lines is not a transportation worker under section 1. (*Kienstra, supra*, 702 F.3d at pp. 955-958.) The employers in *Kienstra* had originally represented to the court "that their trucking employees' activities were strictly limited to three counties in southern Illinois." (*Id.* at p. 956.) Given the nature of the economy in that region, the court noted "it would be somewhat unusual if the truckers did not occasionally carry loads into Missouri," and if they did, the FAA would not apply and the court's "appellate jurisdiction likely would fail." (*Ibid.*) The court therefore "ordered a limited remand for the district court to determine whether the truckers ever carried loads into Missouri or other States." (*Ibid.*) On remand, the district court concluded the truckers had in fact crossed into Missouri, albeit only occasionally. (*Ibid.*) The Seventh Circuit found this deprived it of jurisdiction: "Although [the employer] was primarily engaged in operations within Illinois, its truckers occasionally transported loads into Missouri. This means that the truckers were interstate transportation workers within the meaning of § 1 of the FAA as interpreted by *Circuit City*, which in turn means that the [employees are]

those workers who physically transported goods across state lines, it would have phrased the FAA's language accordingly"].)

The *Nieto* court also relied on cases interpreting the Fair Labor Standards Act (29 U.S.C. §§ 201 *et seq.*) (FLSA), which applies to workers who are "engaged in commerce or in the production of goods for commerce" (*id.* at §§ 203, subd. (s)(1), 206, subd. (a), 207, subd. (a)). We are not convinced FLSA cases are instructive in interpreting section 1. Unlike section 1 of the FAA, which must "be afforded a narrow construction" (*Circuit City, supra,* 532 U.S. at p. 106), "[c]ourts interpret the employment definitions in the FLSA broadly and comprehensively to accomplish the remedial purposes of the [FLSA]" (*Gunn v. Stevens Security & Training Services, Inc*. (N.D. Ill., Jan. 26, 2018, No. 17 CV 6314) [2018 U.S. Dist. LEXIS 13498, 2018 WL 572512, at *1]).

12

excluded from the FAA's coverage." (*Id.* at p. 957.) Although the *Kienstra* court did not *expressly* hold that crossing state lines is a prerequisite for a trucker to qualify as a transportation worker, the court considered whether the drivers crossed state lines to be dispositive of appellate jurisdiction under the FAA.

More recently, several federal district courts concluded a delivery driver who does not cross state lines is *not* a transportation worker under section 1. (See, e.g., *Bonner v. Michigan Logistics Inc.* (D. Ariz. 2017) 250 F.Supp.3d 388, 392, 397 [drivers hired by delivery logistics company who performed deliveries for automotive parts shop and who did not move goods across state lines were not transportation workers]; *Vargas, supra*, 2016 WL 946112, at *4-5 [driver who delivered airline passengers' delayed luggage solely within California was not a transportation worker where there was no evidence he "[made] interstate deliveries even occasionally"]; *Levin, supra,* 146 F.Supp.3d at pp. 1152-1154 [driver who delivered locally prepared food to California customers and who never "made trips across state lines" was not a transportation worker].)[6] These cases may be factually distinguishable, however, to the extent they involved delivery drivers rather than truckers: a delivery driver who delivers goods only locally is ostensibly less connected with interstate commerce than a trucker whose primary purpose is to continue the flow of interstate commerce by transporting out-of-state freight and cargo to their intended destination.

---

[6] Two other recent district court opinions reached similar results. (See *Magana v. DoorDash, Inc.* (N.D. Cal., Oct. 22, 2018) 343 F.Supp.3d 389 [2018 US Dist. LEXIS 176965, No. 18-CV-03395-PJH) 2018 WL 5291988, at p. *5] [food delivery driver who never crosses states lines is not a transportation worker]; *Lee v. Postmates Inc.* (N.D. Cal., Oct. 15, 2018, No. 18-CV-03421-JCS) 2018 WL 4961802, at *8 ["couriers who deliver goods from local merchants to local customers" are not exempt under section 1].) Both opinions have been appealed and are currently pending review by the Ninth Circuit.

13

4. Application

Recognizing the apparent split in this area, but taking into account the circumstances as a whole, we conclude Muller was "'actually engaged in the movement of goods in interstate commerce'"" (*Circuit City, supra*, 532 U.S. at p. 112) and qualifies as a transportation worker under section 1. His employer, RMFL, is a licensed motor carrier company in the business of transporting freight and thus is part of the transportation industry. And the vast majority — *over 99 percent* — of the goods Muller transported originated across state lines. Thus, even though Muller was not personally transporting goods from state to state, he played an integral role in transporting those goods through interstate commerce. We therefore conclude Muller is exempt from FAA coverage.

The Eighth Circuit's multifactor analysis from *Lenz* supports our conclusion. Muller, a trucker, undeniably worked in the transportation industry; he transported goods in interstate commerce, at least in the sense that the goods he transported originated outside California and he transported them during part of their journey to their ultimate destination; he handled goods that had traveled interstate; the vehicle he drove was vital to RMFL's commercial enterprise; a strike by RMFL's drivers would interrupt the free flow of goods coming into California from other states and countries in the same way a strike by seamen or railroad employees would; and he could not perform his job without his truck, reflecting the close nexus between his job duties and the vehicle he used in carrying out his duties. (See *Lenz, supra*, 431 F.3d at p. 352.) Thus, six of the eight *Lenz* factors are met.

The fourth *Lenz* factor — whether the employee supervised employees who are themselves transportation workers — is inapplicable. That leaves the fifth factor — whether, like seamen or railroad employees, Muller was in a class of employees for which special arbitration already existed when Congress enacted the FAA. This is the only *Lenz* factor that weighs against Muller being a transportation worker. Unlike

14

seamen and railroad employees, there is no federal arbitration legislation specifically governing the resolution of disputes between truck drivers and their employers, which suggests Congress did not intend to exclude truckers from FAA coverage. That said, considering six of eight *Lenz* factors weigh in favor of Muller being a transportation worker, the fifth *Lenz* factor is not conclusive.

RMFL argues Muller never crossed state lines in making his deliveries and thus was not "engaged in" interstate commerce. The intrastate nature of Muller's work, however, should not be viewed in a vacuum. "[A]n employee's classification for purposes of § 1 [should be reached] after a case-by-case, factual determination." (See *Lorntzen, supra*, 316 F.Supp.2d at p. 1097.) The various other circumstances of Muller's employment — especially that his employer is in the transportation industry and over 99 percent of the goods he transported originated outside California — collectively weigh in favor of him being a transportation worker under section 1. We therefore conclude Muller is exempt from FAA coverage.

C.     *Section 229 Applies to Muller's Cause of Action for Unpaid Wages*

Because the FAA is inapplicable, our analysis is exclusively guided by California law, and more specifically, section 229. (Cf. *Perry*, *supra*, 482 U.S. at p. 491 [if FAA applies, FAA preempts the application of section 229]; *Performance Team, supra,* 241 Cal.App.4th at p. 1240.)

Section 229 authorizes lawsuits for unpaid wages even if the parties agreed to arbitrate these claims: "Actions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate."

Section 229 renders the parties' arbitration agreement ineffective on Muller's cause of action for unpaid wages. The trial court therefore correctly stayed the prosecution of Muller's unpaid wages cause of action pending the arbitration of his other claims.

15

D.      *Who Decides the Issue of Classwide Arbitrability*

The final issue raised on appeal is the question of who decides whether the arbitration will be on an individual or classwide basis.  As noted, the trial court concluded the arbitrator, not the court, must answer that question.

RMFL asks us to reverse this portion of the order, but it is not clear RMFL may appeal that ruling.  RMFL cites Code of Civil Procedure section 1294, but none of section 1294's subdivisions apply to an order directing the arbitrator to evaluate the availability of classwide arbitration.[7]  Further, the portion of the order in question was made in conjunction with the trial court's decision to compel five out of six causes of action to arbitration, and "an order compelling arbitration is not appealable."  (*Vivid Video, Inc. v. Playboy Entertainment Group, Inc.* (2007) 147 Cal.App.4th 434, 442.)

Even if we were to assume the issue is appealable and reach the merits of RMFL's argument, we would affirm.  In *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233 (*Sandquist*), our Supreme Court concluded there is "[n]o universal rule" about who decides whether an arbitration agreement permits class arbitration.  (*Id.* at pp. 243, 251-252, 260.)  Instead, the parties' agreement as interpreted under state contract law dictates the answer.  (*Id.* at p. 244.)  When an agreement drafted by an employer does not expressly permit or prohibit class arbitration, but states the arbitrator must resolve "all disputes," as was the case here, it logically follows that the arbitrator must resolve issues of class arbitrability.  (*Id.* at pp. 245-248.)  We therefore agree with the trial court that the arbitrator must determine whether to conduct the arbitration on an individual or classwide basis.

---

[7]      "An aggrieved party may appeal from: [¶] (a) An order dismissing or denying a petition to compel arbitration.  [¶]  (b) An order dismissing a petition to confirm, correct or vacate an award.  [¶]  (c) An order vacating an award unless a rehearing in arbitration is ordered.  [¶]  (d) A judgment entered pursuant to this title.  [¶]  (e) A special order after final judgment."  (Code Civ. Proc., § 1294.)

16

RMFL contends the agreement prohibits class arbitration because other appellate courts reached this conclusion when analyzing identical arbitration agreements. RMFL misses the point. The issue is not how to interpret the agreement, but who interprets it. Simply put, the trial court cannot do the arbitrator's job for the arbitrator. Because the threshold question of classwide arbitrability is left for the arbitrator, any arguments regarding whether or not the agreement prohibits class arbitration must be left for the arbitrator's consideration.

## III.

### DISPOSITION

The order is affirmed. Muller shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

17